# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

**In re:**

**WASHINGTON LOOP, LLC**                    Case No.: 9:11-bk-06053-JPH
                                             Chapter 11 Case

    **Debtor.**
_____/

## AMENDED DISCLOSURE STATEMENT FILED IN SUPPORT
## OF DEBTOR'S AMENDED PLAN OF REORGANIZATION

## I.      INTRODUCTION

This is the Amended Disclosure Statement (the "Disclosure Statement") in the Chapter 11 case of Washington Loop, LLC. This Disclosure Statement contains information about the Debtor and describes Washington, LLC's, Amended Plan of Reorganization (the "Plan").

> ***YOUR RIGHTS MAY BE AFFECTED. YOU SHOULD READ THE PLAN AND THIS DISCLOSURE STATEMENT CAREFULLY AND DISCUSS THEM WITH YOUR ATTORNEY. IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.***

### A.      Purpose of this Document

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case,

- How the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you will receive on your claim or equity interest if the plan is confirmed),

- Who can vote on or object to the Plan,

- What factors the United States Bankruptcy Court for the Middle District of Florida (the "Court") will consider when deciding whether to confirm the Plan,

- Why the Debtor believes the  Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and

- The effect of confirmation of the Plan.

Be sure to read the Plan as well as this Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights. All terms used herein shall have the meaning set forth herein or, if not defined herein, shall have the meaning set forth in the definitions section of the Plan. A copy of the Plan is attached hereto as **Exhibit "A".**

B.      **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

The Court has not yet approved this Disclosure Statement as containing adequate information, nor confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1.      *Time and Place of the Hearing to Approve This Disclosure Statement and the Hearing on Confirmation*

The hearing at which the Court will determine whether to approve this Disclosure Statement will take place on _____, 2011 at _____ a.m. / p.m., at the United States Courthouse, 2110 First Street, Ft. Myers, Florida 33901. Following approval of the Disclosure Statement, the hearing at which the Court will determine whether to approve the Plan will take place on _____, 2011 at _____ a.m. / p.m., at the United States Courthouse, 2110 First Street, Ft. Myers, Florida 33901.

2.      *Deadline For Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot to the Clerk of the Bankruptcy Court at the above address, with a copy to Hugo S. deBeaubien, Esq., 101 E. Kennedy Blvd., Suite 2800, Tampa, Florida, 33602. See section IV.A. below for a discussion of voting eligibility requirements. **Your ballot must be received by _____ or it will not be counted.**

3.      *Deadline For Objecting to the Adequacy of the Disclosure Statement and Confirmation of the Plan*

Objections to this Disclosure Statement must be filed no later than _____. Objections to confirmation of the Plan must be filed no later than _____.

4.      *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact Hugo S. deBeaubien, Esq., at Shumaker, Loop & Kendrick, LLP, 101 E. Kennedy Blvd., Suite 2800, Tampa, Florida, 33602; Tel.: 813-221-7425; Email: bdebeaubien@slk-law.com.

C.      **Disclaimer**

*The Court has not yet approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court may approve this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted. This Disclosure Statement is subject to final approval at the hearing on confirmation of the Plan.*

**The Remainder of this Page Intentionally Left Blank**

## II.     BACKGROUND

### A.     Description of Debtor's Business

Washington Loop, LLC ("Washington Loop," "Debtor," "Debtor-in-Possession," or "Reorganized Debtor," as appropriate), a Florida limited liability company, was created April 2007. The Debtor owns two parcels of real property and improvements—the Loop Property and the Mirror Lakes Property—which, together, comprise approximately 474 adjoining acres in Punta Gorda, Charlotte County, Florida. The Debtor's operations on the Property consist of the mining and refining of aggregate materials and, in particular, sand.

### B.     Purchase of the Property and Financing

Washington Loop was formed in April, 2007 for the sole purpose of purchasing the Loop Property in Punta Gorda, Florida. The Loop Property was purchased for excavation and development by Washington Loop in June 2007. The Loop Property consists of 282 acres on Washington Loop Road, Punta Gorda, Florida. The Debtor closed on the Loop Property as divided into 129 legal subdivided parcels, which was done to preserve the 1-3 acre lots from a recorded plat map, thereby superseding any zoning or land use plans in Charlotte county.

The Loop Property was purchased with the intent of mining 120 acres which would give rise to a system of lakes that could later be used in a land development program. The Debtor acquired a variety of permits in advance of commencing operations and conducted several environmental studies in order to apply for a county excavation permit. After two and a half years, the Debtor obtained the necessary permits and a final county permit for excavation was issued in May 2009. However with the final stipulations it was Oct of 2009 before the county permit was released for use.

A $6,000,000.00 loan from Wachovia Bank provided the financing required to purchase the initial portion of the Loop Property. The Debtor then closed the purchase of the remaining balance of the Loop Property from Mike Treworghy and an entity called South Loop, LLC. For permitting reasons, the Debtor purchased both the balance of the South Loop Property and the name "South Loop LLC." The purchase price for the remaining balance of the Loop Property was $6.3 M dollars.

In September 2007, the Debtor closed on a $6.7M loan with Busey Bank at an interest rate of 7.75% with all members of the Debtor signing personal guarantees as individuals, as well as the trusts of Mike Beaudion Dan Beaudion and CA Robinson signing guarantees. The Busey bank loan was a short term note that the bank had agreed to renew for a longer period of time after the permit was obtained, which increased the value of the land to more than double what it had been as a strictly agricultural property. An affiliate of an insider, ROBI1956, LLC, now holds the first mortgage on the Loop Property; Mike Treworgy holds a second mortgage on the Loop Property.

In May of 2008 the debtor purchased West Points Investment Parnters VIII, LLC ("West Points"), whose sole asset was the Mirror Lakes Property and whose 192 acres had two existing permits on it for excavation. The purchase price for West Points and the Mirror Lakes Property was $11,200,000.00. Washington Loop assumed West Points', first mortgage on the Mirror Lakes Property held by Liberty Bank in the amount of $6,600,000.00. The balance of the purchase price in the amount of $4,600,000.00 was financed through Mirror Lakes V, LLC, who holds a second mortgage on the Mirror Lakes Property.

### C. Mortgages on the Property

The Debtor's two properties—the 282 acre Loop Property and the 192 acre Mirror Lakes Property—are each encumbered by two mortgages. The Loop Property is subject to a first mortgage held by ROBI1956, LLC, in the amount of approximately $7,200,000.00 and a second mortgage held by Mike Treworgy in the amount of $1,000,000.00. The Mirror Lakes Property is subject to a first mortgage held by Liberty Bank in the amount of $6,300,000.00 and a second mortgage held by Mirror Lakes V, LLC, in the amount of approximately $3,000,000.00.

### D. Reason for Filing Chapter 11

The Debtor has significant equity in the Property it owns and operates, particularly in light of the prospect of operational improvements contemplated herein. However, the Debtor seeks through this Chapter 11 case to restructure or refinance its secured debt—in particular, the above-described mortgages encumbering the Property. The current holder of one of the mortgages on the Property—ROBI1956, LLC—is an affiliate of an insider who may have acquired said Mortgage, in part, with Debtor funds. Consequently, there may be some dispute as to the amounts due to this creditor which will need to be resolved through a contested matter in this bankruptcy case or a related adversary proceeding. Notwithstanding the foregoing, the Debtor is nevertheless unable to satisfy all of its current obligations at its present operational levels. The Debtor commenced this Chapter 11 case in order to seek funding from a third party lender, which may need to prime the existing mortgages on the Property over the objection of such mortgage holders, in order to purchase equipment that will enable the Debtor to realize its full operational potential and allow the Debtor to pay its secured and unsecured creditors in full pursuant to the proposed Plan. Any such priming lien would, the Debtor submits, increase the value of the Property as a going concern in an amount far in excess of any additional indebtedness incurred, thereby rendering all secured creditors over-secured by virtue of their equity in the Property.

### E.      Insiders of the Debtor

The Debtor has four members, one of whom is also its managing member:

| | |
|---|---|
| Estate of Charles A. Robinson | 38% |
| Michael Beaudoin | 23.3% |
| Daniel Beaudoin | 23.3% |
| Lovina Lehr (Managing Member) | 15.4% |

Although the Equity Security Holders will receive a one hundred percent (100%) stake in the Reorganized Debtor, none of the Equity Security Holders will receive any distribution on account of any asserted claim they may hold against the Debtor or its Estate until all other classes of creditors are paid in full pursuant to this Plan.

### F.      Management of the Debtor Before, During and After the Bankruptcy

During the 4 years prior to the date on which the bankruptcy petition was filed, and during the pendency of the Debtor's Chapter 11 case, Debtor's operations have been managed by Lovina Lehr, who is also the Debtor's managing member.   After the Effective Date of the Order confirming the Plan, the Reorganized Debtor will continue to be managed by Lovina Lehr.

### G.      Claims Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims.  Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld.  The procedures for resolving disputed claims are set forth in Article VI of the Plan.

### H.      Current and Historical Financial Conditions

The identity and fair market value of the estate's assets are as follows:

The Debtor's Property described on **Composite Exhibit "B"** and located in Charlotte County, Florida has a current fair market value as a going concern of approximately $41,000,000.00 to $45,000,000.00, based on an appraisal which was conducted by Gillott Appraisal Services, Inc. and which is dated August 6, 2010.  A true and correct copy of the appraisal is attached hereto as **Exhibit "C".**  Accordingly, each of the Mortgage Holders is fully secured and will be paid in full on account of their Allowed Secured Claims as provided under the Plan.

The Debtor's Plan also proposes payment on account of those claims held by various taxing authorities, creditors whose claims are secured by personal property of the Debtor, creditors whose claims are unsecured, and insiders or affiliates of the Debtor.   The Debtor

submits that, upon this Court's anticipated approval of a post-petition credit facility ("DIP Facility") in the amount of $3,250,000.00, the Debtor will be able to purchase equipment which will enable the Debtor to grow its monthly income from operations from its current level of approximately $51,000.00 per month to an average of over $400,000.00 per month in the first quarter of 2012. Consequently, the Debtor anticipates that it will be readily able to satisfy its obligations as set forth in the Plan.

## I.      Summary of Debtor's Move-Forward Strategy

In an effort to resolve the financial problems that led to the Bankruptcy filing, the Debtor has implemented, or will implement, the following procedures:

As of the Petition Date and during the pendency of this case to date, the Debtor has self-funded the mining operation. Contemporaneous with the filing of the Plan and Disclosure Statement, the Debtor seeks the Bankruptcy Court's approval to obtain super priority financing from a third-party source to allow for the purchase of equipment that will allow the Debtor to ramp up its mining operation and dramatically increase its profitability and ability to cash flow. As of the writing of this Disclosure Statement, the Debtor is also endeavoring to expand its client base and following through on expansion of the mining operation as follows:

### 1)   Lake systems and Excavation

The Debtor is currently excavating the lakes on Loop Property. While demand for the type of sand that the Debtor mines has waned during the recent economic downturn, the Debtor has experienced significant demand since it reopened the mine in January 2011, and such demand has continued to climb. In February 2011, the Debtor's only competitor within 10 miles closed due an expired permit and other regulatory difficulties. This allowed the Debtor to raise prices and led to an increase in demand by approximately 50 percent.

Lakes located on the Debtor's Property have highly sought after and limited access natural resource materials not found on other permitted sites. Specifically, the materials consist of silica and beach sands. Uses for the sands range from mitigation of beach erosion to uses in the bio-thermal oil industry and crucibles for making plastics. These uses will allow the Debtor to sell its treated sands for anywhere from $18 to $43 dollars per ton, as compared to the $5 per ton that it is currently receiving for earth works materials (for uses such as compaction and fill materials for roads) because the Debtor does not have the refining capacity to sell material for the higher-end uses.

The Debtor has not started preparing the material silica and beach sands due to insufficient funds. If approved, the DIP Credit Facility will enable the Debtor to capitalize the mining of the silica sands; through the implementation of the silica sands mining, the Debtor projects substantial sustainable cash flow which will enable the Debtor to pay all creditors in full sooner than would be attainable without the funding of the super priority loan.

## 2) Water Uses

The Debtor has spent approximately two years arranging for a public/private venture with the City of Punta Gorda, which will allow the City to utilize the Debtor's resources to address a state mandate to correct a water problem regarding total dissolvable solids ("TDS") levels that are too high in the county water supply, as well as the presence of other dangerous elements that are at unacceptable levels. The county water treatment center is 1 mile from the Property and the Debtors on-site water would provide the city with much-needed water for dilution of the TDS and the other related problems. The Debtor is designated as stage 2 of the county project, first placing 6 wells on the site for immediate relief and then by approximately 2014, using the ground and storm water from the on-site lakes systems to supply the needed water to the city. The Peace River authority has also approved a 2011-2014-loop system to be put into place running on Washington loop to plant and into the city. This requires millions of tons of sand for the groundwork as well as they intend to connect the pipe system into this for the Punta Gorda water system from us. The meeting to start that project was held on March 15, 2011, and was marked as a project to proceed with and as a project to be funded by South Florida Water Management District.

## 3) Site Development

The Loop Property has 129 approved platted lots in Charlotte County which are subject to county zoning. Accordingly, if one owner owns all parcels within a certain part of land they may utilize the up-zoning/down-zoning clause in the county ordinance to adjust the plat map so as to best utilize the available housing density. There is also a transferrable density units ("TDU") in southwest Florida that allows a property owner to purchase or sell density to reduce the amount of density on a parcel or increase it for development.

The Mirror Lakes Property is governed by the local zoning and future use plan and held to zoning allowing for 1 to 5 units per acre, meaning that after the lakes are taken into consideration, there are approximately 59 lots that will be buildable on a stand-alone basis. However, it is also written in the ordinance that if a sole owner (such as the Debtor) holds over 300 acres, then 20 percent of the total acres can be utilized for commercial use if acceptable in the future land use plan of the area. The Charlotte County future land use map includes the improvement of highway 17--known as the 17 Corridor Expansion Project--and the expansion runs directly past the Property, which is the only large parcel of land left for development within the plan.

A constraints and confines study done by Wilson Miller in Port Charlotte Florida rendered the best use of this site after the lakes systems and excavation is completed to be a high end equestrian development with stables for horses valued at $100,000.00 or more. This was based on a market that is not confined to the economics by market. There is a large community need for this type development, as currently anyone holding or showing their horses in the area has to stall them in Fox Lee, 50 miles to the north, or Naples, 60 miles to the south. Per the study, there is current demand for such a site with stables and commercial space for shows that would not be confined or delayed by the current broad economic malaise.

III.    **SUMMARY OF THE CHAPTER 11 PLAN**
        **AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

      A.      **What is the Purpose of the Chapter 11 Plan?**

As required by Chapter 11 of Title 11 of the United States Code (the "Code"), the Plan places Creditors and Equity Security Holders in various classes and describes the treatment each class will receive on account of their allowed claim amounts. The Plan also provides whether each class of Claims or Equity Security Holders is impaired or unimpaired. Unimpaired classes will receive payment in full on their allowed claim amounts. Impaired classes will receive either payment in full under circumstances less advantageous than previously agreed upon between the claim holder and the Debtor, or pro rata payment of their allowed claim amounts. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan and will be paid on terms set forth in the Plan, as confirmed.

      B.      **Unclassified Claims**

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.

*Administrative Expenses and Priority Claims*

Administrative expenses are costs or expenses of administering the Debtor's Chapter 11 case which are allowed pursuant to § 507(a)(2) of the Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the petition date of October 28, 2010 ("Petition Date"). The Bankruptcy Code requires that all administrative expenses be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated administrative expenses, and their proposed treatment under the Plan:

| **Type** | **Estimated Amount Owed** | **Proposed Treatment** |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After the Petition Date | Unknown | Paid in full on the Effective Date of the Plan, or according to terms of obligation, if later. |
| Professional Fees, not yet approved by the Court.<br>**Shumaker, Loop & Kendrick, LLP—Counsel for the Debtor**<br><br>**Palm Harbor Law Group, P.A.—Counsel for the Debtor** | $150,000.00 (Approx.)<br><br>$50,000.00 | Paid in full on the Effective Date of the Plan, or according to separate written agreement, or according to Court Order if such fees have not been approved by the Court on the effective date of the Plan |
| Clerk's Office Fees | Unknown | Paid in full on the Effective Date of the Plan |
| Other administrative expenses | Unknown | Paid in full on the Effective Date of the Plan or according to separate written agreement |
| Office of the U.S. Trustee Fees | Unknown | Paid in full on the Effective Date of the Plan |
| TOTAL | $200,000.00 (Approx.) | |

C.    **Classes of Claims and Equity Interests**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

1.    *Priority Claims*

| Class 1 –Priority Creditors:<br><br>Florida Department of Revenue<br><br>Charlotte County Tax Collector | Unimpaired. | Priority Creditors will be paid in full as of the Effective Date of this Plan. |
|---|---|---|

2.    *Classes of Secured Claims*

| Class | Description | Impairment | Description of Treatment |
|---|---|---|---|
| Class 2 | Secured Claim of Charlotte County Tax Collector and Tax Lien Certificate Holders (if any) | Impaired | The Allowed Secured Claim of the Charlotte County Tax Collector and/or of any Tax Lien Certificate Holders will be paid consistent with the Allowed Amount of such claim, or such principal amount as may be reflected on the face of the tax lien certificate, which shall constitute its Allowed Claim amount in annual payments to be made over the course of five years from the Effective Date of this Plan along with interest at the rate reflected on the face of the tax lien certificate or at the rate of 8% per annum, whichever is lower, from Estate Assets.  As a result of the treatment afforded herein, the Charlotte County Tax Collector and any Tax Lien Certificate Holders will be precluded from exercising their statutory rights and remedies normally afforded in the collection of delinquent ad valorem real estate and tangible personal property taxes or collection under such tax lien certificates. |

| Class | Description | Impairment | Description of Treatment |
|---|---|---|---|
| Class 3 | **Secured claim of Mortgage Holders**<br><br>Liberty Bank—First Mortgage on Mirror Lakes Property<br><br>Mirror Lakes V, LLC—Second Mortgage on Mirror Lakes Property<br><br>ROBI1956, LLC—First Mortgage on Loop Property<br><br>Mike Treworgy—Second Mortgage on Loop Property<br><br>DIP Lender | Impaired | The Allowed Amount of the Allowed Secured Claims of the Mortgage Holders will each be paid on the basis of a 25 year amortization, with a 7 year balloon payment at an interest rate consisting of the Prime Rate of interest (determined annually on January 1 of each year) plus 2% interest, subject to an interest rate floor of 3.75%. Each year the interest rate will adjust on the anniversary date of the Effective Date and may be adjusted upwardly or downwardly up to 0.5% per year based upon the January 1 Wall Street Journal Prime Rate plus 2% formula ("Real Property Payments"). The Real Property Payments will be paid from operational cash flow.<br><br>As an alternative to the foregoing treatment, any of the holders of Allowed Secured Claims may elect to convert their Allowed Secured Claims to Equity Security Interests in the Reorganized Debtor with such electing Allowed Secured Claims' Holders taking an aggregate 75% stake in the Reorganized Debtor's Equity Security Interests proportionate with the Allowed Amount of the Secured Claims so electing to the total Allowed Secured Claims in this class. |
| Class 4 | Secured Claims of Personal Property Lien Holders | Impaired | Those creditors who hold properly perfected liens on personal property of the Debtor will each be paid in full on account of Allowed Amount of their Allowed Secured Claim over a period of 5 years with annual interest to accrue at the Prime Rate of interest (determined annually on January 1 of each year) plus 2% interest, subject to an interest rate floor of 3.75%. Each year the interest rate will adjust on the anniversary date of the Effective Date and may be adjusted upwardly or downwardly up to 0.5% per year based upon the January 1 Wall Street Journal Prime Rate plus 2% formula ("Personal Property Payments"). The Personal Property Payments will be paid from operational cash flow. |

3.      *Classes of Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

The following chart identifies the Plan's proposed treatment of general unsecured claims against the Debtor:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| Class 5 | Non-Insider Unsecured Creditors | Impaired | Non-Insider Unsecured Creditors holding Non-Insider Allowed Claims will be paid through a series of Distributions totaling 75 percent (75%) of their Allowed Amount of their Allowed Claim, without interest, to be made on a quarterly basis, at a rate of three and three quarters percent (3.75%) of the Allowed Amount of their Allowed Claim per quarter, beginning on the Effective Date of this Plan and continuing for a period of five years. Any Disputed Claim or Claim for which an objection has been interposed shall have its proportionate quarterly distributions disbursed into a segregated escrow account pending the resolution of the claim objection. |
| Class 6 | Unsecured Claims of Insiders and Affiliates of the Debtor | Impaired | Unsecured Creditors who are Insiders or Affiliates of the Debtor will be paid through a series of Distributions totaling 75 percent (75%) of their Allowed Amount of their Allowed Claim, without interest, to be made on a quarterly basis, at a rate of three and three quarters percent (3.75%) of the Allowed Amount of their Allowed Claim per quarter, beginning on the Effective Date of this Plan and continuing for a period of five years only after all Class 1-5 Allowed Claims have been paid in full. Any Disputed Claim or Claim for which an objection has been interposed shall have its proportionate quarterly distributions disbursed into a segregated escrow account pending the resolution of the claim objection. |

| | | | As an alternative to the foregoing treatment, any of the holders of Allowed Unsecured Claims of Affiliates and Insiders may elect to convert their Allowed Claims to Equity Security Interests in the Reorganized Debtor with such electing Allowed Claims' Holders taking an aggregate 25% stake in the Reorganized Debtor's Equity Security Interests proportionate with the Allowed Amount of the Claims so electing to the total Allowed Claims in this class. |
| --- | --- | --- | --- |

4.      *Class of Equity Security Holders*

Equity Security Holders are parties who hold an ownership interest in the Debtor.  In a limited liability company, the members of the LLC are Equity Security Holders.

The following chart sets forth the Plan's proposed treatment of the class of Equity Security Holders:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| Class 7 | Equity Security Holders | Impaired | If any of the debt to equity conversions contemplated in the Class 3 and 6 treatment sections are made, all of the Equity Security Holders' Allowed Interests will be cancelled and such Equity Security Holders shall receive nothing on account of their pre-petition Equity Security Interests.  In the event that none of the debt to equity conversions contemplated in the Class 3 and 6 treatment sections are made, all Equity Security Holders shall receive a distribution of membership interests in the Reorganized Debtor consistent with their on account of their pre-petition Equity Security Interests. |

D.      **Means of Implementing the Plan**

1.      *Source of Payments*

The Reorganized Debtor will continue its mining operations on the Property and will fund all distributions required under this Plan from such Operations.

2.      *Post-confirmation Management*

The Reorganized Debtor will be responsible for management of the Property and all operations.  Unless otherwise agreed prior to the Confirmation Hearing, the person having primary responsibility for the management of the Mine and the Reorganized Debtor shall be Lovina Lehr.

E.      **Risk Factors**

Assuming that the Plan is confirmed, the Plan's success going forward depends almost entirely on the Reorganized Debtor's ability to obtain the requested DIP Credit Facility and to utilize the funds available thereunder to improve its operational liquidity.  The Debtor anticipates that it will continue to enjoy strong demand for its aggregate product, with increased demand upon completion of equipment upgrades facilitated by the DIP Credit Facility.   However, in the unlikely event that the Debtor does not experience the anticipated demand, or to the extent that the Debtor cannot command the expected price per ton for its refined aggregate, the Debtor may fall short of its operations projections.   The Debtor believes, however, that it has provided conservative projections with respect to both demand and the price per ton that it will receive for its aggregate product after the equipment upgrade, and thus perceives the risk of any of these factors negatively impacting its ability to meet its obligations under the Plan as very low.

F.       **Executory Contracts and Unexpired Leases**

The Plan provides a means by which all executory contracts and unexpired leases will be assumed or rejected by the Debtor under the Plan.  Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any.

If you object to the assumption of your unexpired lease or executory contract, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not assumed as provided in the Plan, or the subject of a separately filed Motion to Assume or Reject, will be rejected under the Plan.  Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

*The Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of a Lease or Contract Is Thirty (30) days after the rejection of any Lease or Contract, notwithstanding the Bar Date.*  Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.


G.       **Tax Consequences of Plan**

*CREDITORS AND EQUITY INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.*

## IV.   CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmed, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code.  These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity security interest holder at least as much as the creditor or equity security interest holder would receive in a Chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible.  These requirements are <u>not</u> the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A.   **Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan.  A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that Classes 2, 3, 4, 5, and 6 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan.  The Plan Proponent believes that the other classes of claims are unimpaired and that holders of claims in these classes, therefore, do not have the right to vote to accept or reject the Plan.

### 1.   *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan.  Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest.  When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

***The deadline set by the Bankruptcy Court for filing a proof of claim in this case was June 14, 2011.***

***The deadline for filing objections to claims has not been set, though the Plan proposes that such deadline occur 60 days after entry of the Confirmation Order.***

2.      *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity security interest has the right to vote only if it is in a class which is *impaired* under the Plan.  As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

3.      *Who is **Not** Entitled to Vote*

The holders of the following five types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;

- holders of other claims or equity interests that are not "allowed claims" or "allowed equity security interests" (as discussed above), unless they have been "allowed" for voting purposes.

- holders of claims or equity interests in unimpaired classes;

- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and

- holders of claims or equity interests in classes that do not receive or retain any value under the Plan;

- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.***

4.      *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for their claim in each different class.

B.  **Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by cram down on non-accepting classes.

1.  *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

2.  *Treatment of Non-Accepting Classes*

Even if one or more impaired classes reject the Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds non-accepting classes is commonly referred to as a cram-down plan. The Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not discriminate unfairly, and is fair and equitable toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a cramdown confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

C.  **Liquidation Analysis**

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest Holders who do not accept the Plan will receive at least as much under the Plan as such Creditors and Equity Interest Holders would receive in a chapter 7 liquidation. A liquidation analysis is attached hereto as **Exhibit "D"**.

D.    **Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

1.    *Ability to Fund Plan*

The Debtor-in-Possession believes that it will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses that are entitled to be paid on that date and, further, that the Reorganized Debtor will generate sufficient Cash through Operations to fund the Plan during the Plan Distribution Period without having to utilize its additional cash on hand following the Effective Date. A projected budget and proforma for the Reorganized Debtor in support of these assertions is attached hereto as **Exhibit "E"**.

*You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.*

**The Remainder of this Page Intentionally Left Blank**

## V.    EFFECT OF CONFIRMATION OF PLAN

### A.    Binding Effect of Confirmation

In accordance with § 1141(a) of the Code, the provisions of a confirmed plan bind the Debtor, any entity issuing securities under the Plan, any entity acquiring property under the Plan, and any Creditor, equity security holder, or general partner in the Debtor, whether or not the Claim or Interest of such Creditor, equity security holder or general partner is impaired under the Plan and whether or not such Creditor, equity security holder or general partner has accepted the Plan.

### B.    Modification of Plan

The Debtor-in-Possession may modify the Plan at any time before confirmation of the Plan.  However, if the Plan is modified, the Court may require a new disclosure statement and/or re-voting on the Plan.

The Debtor-in-Possession may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Court authorizes the proposed modifications after notice and a hearing.

C.     **Final Decree**

Once the Estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Reorganized Debtor, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

DATED this 8th day of September, 2011.

/s/Lovina Lehr_____
As Manager, Washington Loop, LLC

**SHUMAKER, LOOP & KENDRICK, LLP**

/s/ Steven M. Berman_____
Steven M. Berman, Esq.
Florida Bar No. 856290
sberman@slk-law.com
Hugo S. deBeaubien, Esq.
Florida Bar No. 058100
bdebeaubien@slk-law.com
101 E. Kennedy Blvd, Suite 2800
Tampa, FL 33602
Phone: 813-229-7600
Fax: 813-229-1660

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that the foregoing **Amended Disclosure Statement** has been furnished by CM/ECF Notice on the 8th day of September, 2011, or via US Mail on the 9th day of September, 2011 to: **Washington Loop, LLC**, 1133 Bal Harbor, Ste 1139, Punta Gorda, Florida 33950; **Joel S. Treuhaft, Esq.,** 2997 Alt. 19 Suite B, Palm Harbor, Florida 34683-1907**; Office of the United States Trustee**, Middle District of Florida, 501 E. Polk Street, Suite 1200, Tampa, Florida; and to the **Local Rule 1007(d) Parties in Interest** as listed on the attached matrix.

/s/Steven M. Berman_____
**Attorney**

Label Matrix for local noticing
113A-9
Case 9:11-bk-06053-JPH
Middle District of Florida
Ft. Myers
Thu Sep  8 15:30:16 EDT 2011

ASAP
5377 McIntosh Road
Sarasota, FL 34233-3455

Barclay Consulting
91 Vivante
Punta Gorda, FL 33950-2041

Becker & Poliakoff
Six Mile Corporate Park
12140 Carissa Commerce Ct.
Suite 200
Fort Myers, FL 33966-5313

Becker & Poliakoff, PA
c/o Lisa M. Castellano, Esq
311 Park Place Blvd.
Ste. 250
Clearwater, FL 33759-3977

Bermont Partners
1133 Bal Harbor Blvd.
Punta Gorda, FL 33950-6577

Berntsson Ittersagen et al
8401 Murdoc Circle, Ste C
Port Charlotte, FL 33948

Brad Bishop and Lisa Bishop Co-Trustees of t
C/O Roger H. Miller III, Esq.
99 Nesbit Street
Punta Gorda, FL 33950-3636

Brad Bishop as Trustee of the Brad Bishop Pr
C/O Roger H. Miller III, Esq.
99 Nesbit Street
Punta Gorda, FL 33950-3636

(p)US BANK
PO BOX 5229
CINCINNATI OH 45201-5229

Cred Leasing Corp of Florida
P.O. Box 116
Boynton Beach, FL 33425-0116

Gator Petroleum
525 Nesbit Street
Punta Gorda, FL 33950-4936

J H Williams Oil Co.
P.O. Box 439
Tampa, FL 33601-0439

J. Glenn Robinson, Successor Trustee of the
c/o Albert J. Tiseo, Jr., Esq.
701 JC Center Court, Suite 3
Port Charlotte, FL 33954-2826

J. Steven Wilke
US Dept. of Justice
Office of the US Trustee
501 E. Polk Street, Sutie 1200
Tampa, FL 33602-3949

J.H. Williams Oil Company, Inc.
c/o Scott Stigall, Esq.
601 Bayshore Blvd.
Suite 700
Tampa, Florida 33606-2756

Kelly Tractor
P.O. Box 918579
Orlando, FL 32891-0001

Lisa Bishop as Trustee of the Lisa Bishop Pr
C/O Roger H. Miller III, Esq.
99 Nesbit Street
Punta Gorda, FL 33950-3636

Lorenzo Tires & Repair Serv
1946 VeronicaS Shoemaker Blv
Fort Myers, FL 33916-2263

Mary Smith
5201 Point Road
Englewood, FL 34223

Mike Trewergy
Farr Law, Atn Gary Kahle
99 Nesbit Street
Punta Gorda, FL 33950-3636

Mike Treworgy
Farr Law Firm
Attn Gary Kahle
99 Nesbit Street
Punta Gorda, FL 33950-3636

Mirror Lakes V, LLC
c/o Jeffrey W. Leasure, Esq.
P. O. Box 61169
Fort Myers, FL  33906-1169

Nortrax, John Deere
Robert M Coplen PA
10225 Ulmerton Rd, Ste. 5A
Largo, FL 33771-3520

ROBI1956, LLC
P O Box 5269
Evansville, IN 47716-5269

RSC Equipment Rental
P.O. Box 840514
Dallas, TX 75284-0514

Robbie1956, LLC
c/o Altert Tiseo
701 JC Center Court Ste 3
Port Charlotte, FL 33954-2826

Robinson Engineering
P.O. Box 5269
1410 N. Cullen Ave.
Evansville, IN 47715-2331

Ronnies Mobile Repair
P.O. Box 511041
Punta Gorda, FL 33951-1041

Ursine Capital LLC
c/o Michael Chiantella
209 Nassau St. S., Ste. 101
Venice, FL 34285-2358

```
Vickie L Potts                          Wilson Miller, Inc.
18500 Murdock Circle                     P.O. Box 409756
Port Charlotte, FL 33948-1068            Atlanta, GA 30384-9756




        The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
        by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).


Cardmember Service                       End of Label Matrix
P.O. Box 790408                          Mailable recipients    31
Saint Louis, MO 63179-0408               Bypassed recipients     0
                                         Total                  31
```