UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

In re:

Washington Loop, LLC,                                Case No. 9:11-bk-06053-JPH

                                                                                            Chapter 11

      Debtor.
_____/

## MEMORANDUM OPINION ON OWNERSHIP INTERESTS OF THE DEBTOR

Introduction

This matter came before the Court to determine the various ownership interests of the Debtor. It is undisputed that four parties-in-interest possess some ownership/equity interest in the Debtor; however, the specific percentages of ownership among the parties-in-interest are disputed. The equity interest holders are: (i) J. Glenn Robinson, as trustee of the estate of Charles A. Robinson[1] ("Robinson"); (ii) Michael H. Beaudoin; (iii) Daniel C. Beaudoin; and (iv) Lovina Lehr (collectively, the "Members").

The appointed chapter 11 trustee ("Trustee") filed an Amended List of Equity Security Holders ("Equity List") (Doc. 147). In response, Robinson filed a Proof of Equity Interest (Doc. 173), as well as an Objection to the Trustee's Equity List (Doc. 174). Michael H. Beaudoin and Daniel C. Beaudoin (collectively, the "Beaudoins") also objected to the Trustee's Equity List and filed their own Proof of Equity Interest (Doc. 179). The Beaudoins' interests are aligned in this matter.

---

[1] Charles A. Robinson was the signatory to the Third Amended and Restated Operating Agreement of Washington Loop, LLC, dated February 12, 2009. Charles A. Robinson is deceased, and his son, J. Glenn Robinson, as the representative of his father's estate, has claimed an interest in the Debtor.

On October 19, 2011, the Court set the objections to the Trustee's Equity List filed by Robinson and the Beaudoins for final evidentiary hearing (the "Hearing"). At the Hearing, the Trustee, Robinson, and the Beaudoins presented evidence on the competing ownership interests in the Debtor. At the conclusion of the Hearing, the Court took the matter under advisement and directed the parties to submit post-Hearing briefs. The Beaudoins filed a brief (Doc. 198), as did Robinson (Doc. 197), to which the Beaudoins also filed a reply (Doc. 200).

After consideration of the legal argument of counsel and the documentary and testimonial evidence from the Hearing, the Court finds the Members' respective ownership/equity interests in the Debtor to be those reflected on Exhibit B to the Third Amended and Restated Operating Agreement of Washington Loop, LLC, dated February 12, 2009.

## Facts

The Debtor was formed on May 7, 2007, under the name Washington Loop Excavation, LLC.[2] At that time, the Debtor's members consisted of (i) Charles A. Robinson, as Trustee of the Charles A. Robinson Living Trust dated May 19, 1991; (ii) Dirt Cheap Too, LLC; and (iii) Lovina Lehr. The members of Dirt Cheap Too, LLC were Michael Beaudoin, Daniel Beaudoin, and Edward Slifer. At the end of 2007, the ownership interests in the Debtor, as reflected by its

---

[2] On September 5, 2007, the Debtor changed its name to Washington Loop, LLC.

2007 tax return (including the individual Members' K-1 Schedules[3]), were as follows: Robinson – 48%; Dirt Cheap Too, LLC – 48%; Lehr – 4%.[4]

In May of 2008, Mr. Slifer sold his interest in Dirt Cheap Too, LLC to Lehr and the Beaudoins. In order to reflect this change in the ownership structure of the Debtor, the parties executed an Amended[5] and Restated Operating Agreement dated May 15, 2008.[6] The Debtor's members under that amended operating agreement were (i) Charles A. Robinson, as Trustee of the Charles A. Robinson Living Trust dated May 19, 1991; (ii) Michael H. Beaudoin, as Trustee of the Michael H. Beaudoin Revocable Living Trust Agreement dated September 18, 1996; (iii) Daniel C. Beaudoin, as Trustee of the Daniel C. Beaudoin Revocable Living Trust Agreement dated January 3, 1997; and (iv) Lovina Lehr.

On August 29, 2008, the parties executed a Second Amended and Restated Operating Agreement.[7] The members of the Debtor under the second amended agreement remained the same as stated above. Exhibit B to the Second Amended and Restated Operating Agreement listed the ownership interests in the Debtor as follows:

(i) Robinson, as Trustee of the Charles A. Robinson Living Trust dated May 19, 1991): 38%
(ii) Michael Beaudoin, as Trustee of the Michael H. Beaudoin Revocable Living Trust Agreement dated September 18, 1996): 23.3%

---

[3] A Schedule K-1 is an official tax document filed with the Internal Revenue Service. It is prepared for each partner of a partnership, or member of a limited liability company, as the case may be, and reflects each member's share of the limited liability company's profits and losses. The information from the Schedule K-1 is included in each member's personal tax returns, although the Schedule K-1 itself is not filed with the personal tax returns. The Schedule K-1 is, however, filed with the appropriate business tax form, which for a partnership or LLC is Form 1065.

[4] The Court gleans this information from the Debtor's tax returns for the years 2007-2010, which were admitted into evidence at the Hearing as Exhibit # 2 of the Beaudoins.

[5] At the time the Debtor was formed, it apparently had its affairs governed by an initial operating agreement dated May 7, 2007. The initial operating agreement is not of record, as it has not been filed with the Court or admitted by the Court into evidence. The date of, and reference to, the initial operating agreement is taken from the Amended and Restated Operating Agreement, dated May 15, 2008. *See* Trustee's Exhibit # 14.

[6] Trustee's Exhibit # 14.

[7] Robinson's Exhibit # 13.

  (iii) Daniel Beaudoin, as Trustee of the Daniel C. Beaudoin Revocable Living Trust Agreement dated January 3, 1997): 23.3%
  (iv) Lehr: 15.4%.

At the end of 2008, the ownership interests in the Debtor, as reflected by its 2008 tax return (including the individual Members' K-1 Schedules) were consistent with the foregoing percentages listed in Exhibit B to the Second Amended Operating Agreement.

On February 12, 2009, the members of the Debtor made another subtle change in the ownership stakes when Robinson and the Beaudoins assigned their membership interests in the Debtor from themselves in their trustee capacities to themselves in their individual capacities.[8] Also on February 12, 2009, the parties executed a Third Amended and Restated Operating Agreement (the "Operating Agreement").[9] Under the Operating Agreement, the Debtor's members were Robinson, the Beaudoins, and Lehr, all in their individual capacities.

There is no dispute that the Operating Agreement executed by the parties in February, 2009, is the final iteration of operating agreements of the Debtor. It constitutes the most current governing document of the Debtor and the Members' affairs with the Debtor. Like the Second Amended and Restated Operating Agreement, the Operating Agreement contains an Exhibit B, which lists the Members' respective ownership interests in the Debtor. The ownership percentages contained on Exhibit B match the foregoing percentages reflected by the Debtor's 2008 tax return. Likewise, the Debtor's 2009 tax return (including the individual Members' K-1 Schedules) also reflects the same ownership interests (Robinson: 38%; Michael Beaudoin: 23.3%; Daniel Beaudoin: 23.3%; and Lehr: 15.4%).

---

[8] Robinson's Exhibit # 15.
[9] Robinson's Exhibit # 14.

4

Testimony from the Debtor's former certified public accountant, Joseph Schortz, corroborated the ownership interests expressed in the current operating agreement. Mr. Schortz testified at the Hearing that he had prepared the Debtor's tax returns from 2007-2009. Mr. Schortz further testified that in order to facilitate the preparation of the Debtor's 2008 tax return, he prepared an "Ownership Analysis" of the Debtor (the "Schortz Ownership Analysis").[10] While the Schortz Ownership Analysis was prepared in connection with the 2008 tax return, the 2008 tax return was not actually prepared until May 31, 2009 (i.e., over three months after the final Operating Agreement was executed). The Schortz Ownership Analysis also reflects the same ownership interests as Exhibit B to the Operating Agreement. Mr. Schortz testified that in May and June of 2009, he circulated his Ownership Analysis to all the Members, and that none of the Members objected to the Schortz Ownership Analysis or otherwise indicated that their ownership interests had been misstated.

The Court finds Mr. Schortz's testimony to be quite credible despite vigorous cross-examination. While Mr. Schortz did not prepare the Debtor's 2010 tax return, that return is also in evidence. Though prepared by a different accounting firm, it too is consistent with the foregoing ownership percentages. The 2010 tax return was actually prepared in September of 2011, during the pendency of the Debtor's bankruptcy case. The 2010 tax return (including the K-1 Schedules) also attributes a 38% ownership interest to Robinson, a 23.3% interest to each of the Beaudoins, and a 15.4% interest to Lehr.

However, contrary to the ownership interests reflected in the evidence thus far discussed, the Reconciliation of Partners' Capital Accounts Worksheet ("Capital Accounts Worksheet"),[11]

---

[10] Mr. Schortz's Ownership Analysis was admitted into evidence at the Hearing as the Beaudoins' Exhibit # 1.
[11] This document is part of the Beaudoins' Exhibit # 2. The pages of Exhibit # 2 are not numbered, but this one-page document is located ten (10) pages from the end of Exhibit # 2.

which accompanies the 2010 tax return, sheds a different light on the Members' potential ownership interests in the Debtor. The Capital Accounts Worksheet lists the ending capital account balance for each Member. The beginning capital account balances for each Member are stated on Exhibit A to the Operating Agreement, which lists the Members' initial capital contributions.[12] After the Members executed the Operating Agreement in February of 2009, they made additional capital infusions, although Robinson and the Beaudoins dispute whether these capital infusions were true capital contributions, or, instead, were to be treated merely as loans to the Debtor. The Court notes that various "Statements" comprising part of the Debtor's tax returns reveal that the additional capital infusions were booked as "notes payable" to the Members, thus suggesting that the additional capital infusions were in fact treated as loans by the Member. Nevertheless, the Capital Accounts Worksheet includes the additional monies provided to the Debtor (whether as capital contributions or loans) as part of the Members' capital account balances. When reduced to a percentage, the capital accounts result in the following percentages: Robinson – 50.4%; Michael Beaudoin – 22%; Daniel Beaudoin – 20%; Lehr – 7.6%. Thus, there is a disparity in potential ownership interests when contrasting the capital account percentages with the tax return and Exhibit B ownership percentages.

General Summary of the Parties' Positions

The Beaudoins each assert an ownership interest of 23.3%. They argue that the ownership interests as reflected on Exhibit B of the Operating Agreement, and as reported on the Debtor's tax returns from 2007-2010, are controlling, and accurately reflect the agreement and understanding of the Members that the Exhibit B ownership interests would remain constant,

---

[12] The Members' initial capital contributions were as follows: Robinson - $380; Michael Beaudoin - $233; Daniel Beaudoin - $233; Lehr - $154. These dollar amounts, of course, correspond to the Members' ownership percentages listed on Exhibit B of the Operating Agreement.

6

notwithstanding the subsequent monies provided to the Debtor. Therefore, they would attribute a 38% ownership interest to Robinson and a 15.4% ownership interest to Lehr.

On the other hand, Robinson argues that certain provisions of the Operating Agreement, which make reference to a particular section of the Tax Code, require the Exhibit B ownership interests to be recalculated to track the Members' capital accounts. Accordingly, Robinson submits that the percentages reflected by the Members' final capital accounts must prevail. Accordingly, Robinson claims a 50.4% ownership interest and would attribute a 22% and 20% ownership interest to Michael and Daniel Beaudoin, respectively, based on the Capital Accounts Worksheet. The Court must now determine which position prevails.

Conclusions of Law

**I.** *Jurisdiction*

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a) and (b). This is a core proceeding pursuant to 28 U.S.C. § 157(a) and (b)(2)(A) and (b)(2)(O). Accordingly, the Court may enter a final order on this matter under 28 U.S.C. § 157(b)(1).

**II.** *Relevant Provisions of the Operating Agreement*

The Court must address Robinson's argument that the interplay between Articles VIII and IX of the Operating Agreement requires the Court to conclude that the Members' ownership interests in the Debtor must be modified from the percentages listed on Exhibit B to track the fluctuations in the Members' capital accounts. In order to evaluate this argument, the Court will outline the relevant sections of the Operating Agreement and analyze the Tax Code and the corresponding Internal Revenue Service Treasury Regulations.

A. Capital Accounts

Article VIII, Section 4 of the Operating Agreement establishes how the Members' capital accounts are to be maintained. That section requires the capital accounts for each Member to be increased by (i) the amount of money that a particular Member contributes to the Debtor; (ii) the fair market value of any property contributed by the Member to the Debtor; and (iii) the Member's share of the Debtor's net profits and any separately allocated items of income or gain. Each Member's capital account must also be decreased by (i) the amount of money distributed to that Member; (ii) the fair market value of any property distributed to the Member; and (iii) the Member's share of the Debtor's net losses and any separately allocated items of deduction or loss. The Court notes that the maintenance of the Members' capital accounts in this manner appears to track and comply with the rules set forth in the Treasury Regulations.[13] Significantly, the Operating Agreement defines each Member's capital account—as compared with all of the Members' capital accounts—as that Member's "Sharing Ratio."[14]

B. Compliance with Section 704(b) of the Tax Code

Article VIII, Section 6 of the Operating Agreement is entitled "Compliance with Section 704(b) of the Code." It states:

> The provisions of this Article VIII as they relate to the maintenance of Capital Accounts are intended, and shall be construed, and, if necessary, modified to cause the allocations of profits, losses, income, gain and credit pursuant to Article IX to have substantial economic effect under the Regulations promulgated under Section 704(b) of the Code, in light of distributions made pursuant to Articles IX and XIV and the Capital Contributions made pursuant to this Article VIII. Notwithstanding anything herein to the contrary, this Company Agreement shall

---

[13] *See* 26 C.F.R. § 1.704-1(b)(2)(iv)(b).
[14] *See* Operating Agreement, Article II, Section 57 ("with respect to any Member, a fraction (expressed as a percentage), the numerator of which is the total of the Member's Capital Account and the denominator is the total of all Capital Accounts of all Members").

>not be construed as creating a deficit restoration obligation or otherwise personally obligate any Member to make a Capital Contribution in excess of the Initial Contribution.

As discussed in greater detail below, section 704(b) of the Tax Code is implicated when the allocations of profits and losses to a member based on that member's distributive share,[15] as prescribed by the operating agreement, do not have "substantial economic effect."

### C. Allocations

The third section of the Operating Agreement that must be analyzed is Article IX, Section 1. That section prescribes the allocation methodology of the Debtor's business activities to the Members. Generally speaking, it establishes a "waterfall" of allocations. First, any special allocations must be given effect. Special allocations involve disproportionate allocations of a partnership or LLC's profits or losses. *Cormier v. U.S.*, 1987 WL 9248 (D.D.C. Mar. 23, 1987). For example, if a particular member of an LLC is allocated a deduction due to the depreciation in value of property of the LLC, then that member's capital account must be decreased to reflect that allocation. Second, profits are allocated to the Members in an amount equal to their initial capital contributions. Third, any remaining profits, together with all losses, are allocated to the Members in proportion to their respective ownership interests as listed on Exhibit B. There is no prohibition on assigning disproportionate distributive shares to the members of an LLC. The

---

[15] "Distributive share" is the term used in section 704(b) of the Tax Code. Because a limited liability company is treated like a partnership for federal income tax liability purposes under 26 U.S.C. §§ 701 and 761, each member of an LLC is assigned a separate distributive share of income, gain, loss, deduction, or credit pursuant to 26 U.S.C. § 702(a). The purpose of the distributive share provisions is to provide a tool to determine the tax liability of each member of the LLC. *See* 9 Mertens Law of Fed. Income Tax'n § 35A:26. The LLC's individual members report their respective distributive shares on their personal income tax returns. *See generally* Fed. Tax'n Partnerships & Partners ¶ 11.01[1]. Thus, the assignment of a distributive share to each member of the LLC facilitates the underlying policy of taxation set forth in 26 U.S.C. § 701 that the individual members of the LLC—and not the LLC itself—are liable for income tax. Here, the Members' distributive shares are contained in the Operating Agreement in Article IX, Section 1.

capital accounts must simply be adjusted accordingly to reflect the allocations made pursuant to each member's distributive share.

### D. Robinson's Argument

Based on the foregoing sections of the Operating Agreement, Robinson argues that the Members' capital accounts constitute the standard for determining the Members' ownership interests. In other words, even though the Members' ownership interests are expressly stated on Exhibit B, those interests/percentages must be altered at the end of each year to track the Members' capital accounts. Robinson posits that the inclusion of Article VIII, Section 6 in the Operating Agreement leads to this conclusion because that section states that the Members' capital accounts are to be maintained and modified to cause the Article IX, Section 1 allocations to have substantial economic effect. Thus, Robinson concludes that the allocations prescribed by the Operating Agreement are incapable of having "substantial economic effect" within the meaning of section 704(b) unless they track the Members' capital accounts. If accepted, this argument would impact the overarching issue of the Members' ownership interests because the Article IX, Section 1 allocations of profits and losses are one and the same with the Members' ownership interests. Accordingly, the ownership interests would be recalculated to match the capital account balances (i.e., the ownership interests would be the "Sharing Ratios").

The Court rejects Robinson's argument. As discussed more fully below, neither the Tax Code nor the Operating Agreement requires the Members' distributive shares to track or match their capital accounts in order for the allocations to have "substantial economic effect." Instead, the Court finds Article VIII, Section 6 of the Operating Agreement complementary to, and consistent with, the allocations set forth in Article IX, Section 1. The purpose of Article VIII,

Section 6 is to ensure that the prescribed allocation methodology in Article IX, Section 1 of the Operating Agreement would be respected.[16]  In other words, the maintenance of the Members' capital accounts in accordance with the Article VIII, Section 4 and the Treasury Regulations is what allows the agreed-upon allocations to be respected and upheld.  However, the capital accounts do not dictate what the allocations are, or must be.  They simply reflect the allocations made, thereby causing the allocation in question to have substantial economic effect.  Thus, maintaining (i.e., adjusting) the capital accounts to ensure that the allocation have substantial economic effect is different from requiring allocations to match capital accounts.

### III.    *Analysis of the Tax Code and Treasury Regulations*

The narrow issue before the Court is whether allocations can have substantial economic effect without tracking the Members' capital accounts.  If so, then the Beaudoins' position prevails because the allocations prescribed by Article IX, Section 1 will be respected.  On the other hand, if the allocations (and ultimately the Members' Exhibit B ownership interests) must track the Members' capital accounts, then the Robinson position will prevail.  The Court concludes that allocations made pursuant to the Members' distributive shares need not track their capital accounts in order to have substantial economic effect.[17]

---

[16] Utilizing the straightforward example from Section II.C, *supra*, the reduction in the capital account to reflect the allocation of an item of deduction to a particular member ensures that the allocation will be respected.  In other words (using the language from Article VIII, Section 6 of the Operating Agreement), the capital account is maintained and modified in order to cause the allocation to have substantial economic effect.

[17] The Court is not deciding whether the allocations actually had substantial economic effect.  Even if they did not, the allocations would still be made in accordance with the Members' interests in the Debtor.  And as discussed more fully below, the Court finds that the Members' ownership interests are those set forth on Exhibit B.

A.  Distributive Shares

A partnership agreement—or, as applied to LLCs, an operating agreement—is the document in which the members' distributive shares[18] are set forth. The distributive shares are determined by the express terms of the operating agreement. *See* 26 U.S.C. § 704(a). However, Section 704(b) of the Tax Code provides the method for determining each member's distributive share in two limited circumstances: (i) when the operating agreement is silent on the distributive shares; or (ii) if the operating agreement provides for allocations to the members that do not have "substantial economic effect." *See* 26 U.S.C. § 704(b)(1)-(2). In such instances, a member's distributive share is determined in accordance with the member's interest in the LLC, as determined by taking into account all facts and circumstances. *See* 26 U.S.C. § 704(b).

Because the Operating Agreement provides for the distributive shares of the Members, it satisfies the requirement of § 704(a).[19] However, in order for an allocation to a member under an operating agreement to be effective, it must have "substantial economic effect." *See* 26 U.S.C. § 704(b)(2). If the allocation has substantial economic effect, it will be respected. *See* 26 C.F.R. § 1.704-1(b)(1)(i) (stating the three ways in which an allocation provided for in a partnership will be respected: (1) if the allocation has substantial economic effect; (2) if, taking into account all facts and circumstances, the allocation is in accordance with the partner's interest in the

---

[18] The notion of a "distributive share" should not be confused with actual "distributions" made to the members of an LLC. While distributions involve actual transfers of property, a distributive share is the mechanism by which an individual member's personal tax liability is established. This distinction has led to the term "distributive share" being characterized as a misnomer, given that no actual distribution of money or other property is contemplated by 26 U.S.C. § 704. *See* Fed. Tax'n Partnerships & Partners ¶ 11.01[1]. Rather, the distributive share is simply the tax incidence to each member of an LLC based on the LLC's business activities. Here, the distributive shares assigned to the Members for profits and losses in Article IX, Section 1 happen to be the same as their entitlement to actual distributions pursuant to Article IX, Section 5.

[19] Even if the opposite conclusion were reached (i.e., that the Operating Agreement did not provide for the Members' distributive shares, thereby triggering section 704(b)(1)), the Members' distributive shares would still be determined in accordance with the Members' interests in the Debtor under 26 U.S.C. § 704(b). And as discussed in greater detail below, the Court finds that under all the facts and circumstances, the Members' interests in the Debtor are as set forth on Exhibit B.

partnership; and (3) if the allocation is deemed to be in accordance with the partner's interest in the partnership pursuant to one of a number of special rules). But, if the allocation lacks substantial economic effect, then the Tax Code defaults to a determination of the Members' distributive shares in accordance with their interests in the Debtor, which determination is made in light of all facts and circumstances. *See* 26 U.S.C. § 704(b). Thus, in light of Robinson's argument, the Court will next discuss the concept of "substantial economic effect"—not to determine whether the allocations actually had substantial economic effect, but rather to determine whether allocations must track the Members' capital accounts.

B.  <u>Substantial Economic Effect</u>

The requirement of "**s**ubstantial economic effect" ensures that in the event there is an economic benefit or burden that corresponds to an allocation, the partner to whom the allocation is made receives the benefit or bears the burden. *See* 26 C.F.R. § 1.704-1(b)(2)(ii)(a). Whether allocations have substantial economic effect requires a two-part analysis under the Treasury Regulations. *See* 26 C.F.R. § 1.704-1(b)(2)(i). First, the allocation must have economic effect. Second, the economic effect of the allocation must be substantial.

1.  *Economic Effect*

There are three requirements that must be met in order for an allocation to have economic effect. 26 C.F.R. § 1.704-1(b)(2)(ii)(b). First, the partnership agreement must provide for the determination and maintenance of the partners' capital accounts in accordance with the rules of 26 C.F.R. § 1.704-1(b)(2)(iv). Second, the partnership agreement must provide that upon liquidation of the partnership, all liquidating distributions are required to be made in accordance with the partners' positive capital account balances within a certain prescribed time period.

Here, Article XIV, Section 3.2 of the Operating Agreement satisfies this requirement. Again, actual distributions are not to be confused with allocations made pursuant to distributive shares. Third, the partnership agreement must provide for an unconditional deficit restoration obligation for any partner who has a deficit balance in his capital account following the liquidation of his partnership interest.[20]

This final requirement is not satisfied by the Operating Agreement, as Article VIII, Section 6 expressly states that "[n]otwithstanding anything herein to the contrary, this Company Agreement shall not be construed as creating a deficit restoration obligation or otherwise personally obligat[ing] any Member to make a Capital Contribution in excess of the Initial Contribution." However, despite the express negation of this third requirement in the Operating Agreement, the allocations prescribed by the Operating Agreement can still have substantial economic effect under an alternate section of the Treasury Regulations.

As long as the first two requirements described above are satisfied, an allocation can still be deemed to have economic effect—despite the lack of a provision in the partnership agreement obligating a partner to restore to the partnership the deficit in his capital account—if the partnership agreement contains a "qualified income offset" provision. *See* 26 C.F.R. § 1.704-1(b)(2)(ii)(d). The "qualified income offset" provision must cause the partner's capital account to be reduced for certain adjustments, allocations, and distributions as specified in 26 C.F.R. § 1.704-1(b)(2)(ii)(d)(4)-(6). Here, Article IX, Section 4 contains the required "qualified income

---

[20] It is unclear whether this requirement applies to LLC's, as opposed to partnerships, given that one of the primary reasons to form an LLC, as opposed to entering into a partnership, is to insulate one's self from liability for any losses of the LLC. Nevertheless, the Court will proceed as if this requirement applies to members of an LLC.

14

offset" provision, which, together with its incorporated definition of "Offset Table Decrease,"[21] comports with the requirements of 26 C.F.R. § 1.704-1(b)(2)(ii)(d).

Nowhere in the foregoing provisions is there a requirement that allocations must be made in accordance with capital accounts. Rather, allocations that are made must be reflected through modifications to the capital accounts, which, in turn, cause the allocations to have economic effect.

2. *Substantiality of the Economic Effect*

In addition to having economic effect, the Treasury Regulations also require the economic effect to be substantial. *See* 26 C.F.R. § 1.704-1(b)(2)(iii). The general rule, as announced in 26 C.F.R. § 1.704-1(b)(2)(iii)(a), is that an allocation is substantial "if there is a reasonable possibility that the allocation (or allocations) will affect substantially the dollar amounts to be received by the partners from the partnership, independent of tax consequences." Again, there is no requirement that allocations be made in accordance with capital accounts.

3. *Rationale of the Substantial Economic Effect Requirement*

The primary purpose of the section 704(b) substantial economic effect requirement is to ensure that the economic arrangement between the members of an LLC is borne out in reality, and to prevent members from abusing an allocation methodology for their own personal tax benefits. Here, the allocation system does not appear to be designed to contrive beneficial tax consequences for the Members. Rather, allocations are made in accordance with the Members' interests under Article IX, Section 1, and only after any special allocations are given effect and

---

[21] The definition of "Offset Table Decrease" in the Operating Agreement tracks the three types of adjustments, allocations, and distributions that must be accounted for under 26 C.F.R. § 1.704-1(b)(2)(ii)(d)(4)-(6).

the Members' initial capital contributions are fully repaid. The allocation methodology does not attempt to manipulate the tax consequences of the Members or to contrive an impermissible result. For instance, there is no designation of a tax-exempt member who would be assigned all the Debtor's gains, while the other members would be allocated all of its losses (thereby reducing their individual tax liability). Rather, the Members are allocated their tax consequences in proportion to their Exhibit B ownership interests. The Court finds nothing in the Tax Code or Treasury Regulations proscribing such a result, or requiring the allocations/ownership interests to follow the capital accounts.

In fact, the very language of the Tax Code belies such an assertion. Section 704(a) allows distributive shares to be stated in the operating agreement. If Congress wanted to require such distributive shares to track capital accounts, it could have easily stated as much. For example, section 704(a) could instead require distributive shares to be determined by capital accounts instead of whatever methodology is agreed upon by the members of an LLC. Alternatively, Congress could have required in section 704(b) that where allocations made pursuant to an operating agreement lack substantial economic effect, they would be determined in accordance with the members' capital accounts rather than in accordance with the members' respective interests in the LLC. However, Congress has not chosen to follow such a course. Instead, section 704(b) defaults to a determination of distributive shares in accordance with the members' interests in the LLC, accounting for all facts and circumstances.[22]

---

[22] The Treasury Regulations provide a non-exclusive list of facts and circumstances to be considered in such a determination. *See* 26 C.F.R. § 1.704-1(b)(3)(ii)(a)-(d). These factors include: (i) the partners' relative contributions to the partnership; (ii) the interests of the partners in economic profits and losses (if different than that in taxable income or loss); (iii) the interests of the partners in cash flow and other non-liquidating distributions; and (iv) the rights of the partners to distributions of capital upon liquidation.

Likewise, if the Members themselves wanted to have their ownership interests be subject to change, and desired to have their ownership interests track their capital accounts, they could have easily expressed such an intention in the Operating Agreement. For instance, instead of making allocations consistent with the Exhibit B ownership percentages, they could have made allocations in accordance with their Sharing Ratios. For whatever reason, the Members chose a different manner of allocations.

In light of the foregoing, the Court holds that the allocations do not have to track the capital accounts in order to have substantial economic effect. Instead, as mentioned above, the purpose of including Article VIII, Section 6 in the Operating Agreement is to ensure that the allocations agreed upon by the Members would be upheld. Therefore, the Court finds that Article VIII, Section 6 and Article IX, Section 1 work together to achieve the desired result of the Members, and not to force the stated ownership interests on Exhibit B to change based on fluctuations in the Members' capital accounts.

### IV.   *Additional Evidence Concerning the Members' Interests in the Debtor*

Certain evidence admitted at the Hearing also persuasively demonstrates that the Members' interests in the Debtor are those expressly listed on Exhibit B, and that those ownership percentages were to remain unchanged. This evidence inludes: (i) the ownership interests as stated on the Debtor's 2007-2010 tax returns, including the individual Members' K-1 Schedules; (ii) the Schortz Ownership Analysis, which was circulated to and approved by the Members; and (iii) the unrebutted testimony from Michael Beaudoin that the Members never intended to modify their ownership interests and agreed to treat their subsequent capital infusions as loans. On this last point, several documents admitted by the Court into evidence as part of the

Debtor's tax returns bear notations that certain "liabilities" of the Debtor were booked as "notes payable" to the Members.

The Court has considered this evidence not as manifesting an implied, unwritten amendment to the Operating Agreement, but rather as consistent with the lack of any amendment to the Operating Agreement altering the percentages listed on Exhibit B. Given the lack of any written amendment to the Operating Agreement pertaining to the Members' expressly stated ownership interests, the evidence presented at the Hearing serves as a representation of the understanding among the Members—consistent with the written terms of the Operating Agreement—as to what their ownership interests were.

## Conclusion

For the foregoing reasons, the Court concludes that the Article IX, Section 1 allocations do not need to track the Members' capital accounts, and that the equity interests of the Members as stated on Exhibit B of the Operating Agreement are controlling. Accordingly, the equity ownership interests in the Debtor are as follows:

J. Glenn Robinson, as representative of the estate of Charles A. Robinson, deceased: 38%;
Michael Beaudoin: 23.3%;
Daniel Beaudoin: 23.3%; and
Lovina Lehr: 15.4%.

Dated: January 25, 2012.                    BY THE COURT

_____
Jeffery P. Hopkins
United States Bankruptcy Judge